NATIONAL SERVICE INDUSTRIES,
INC., Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 14209.

United States District Court,
N. D. Georgia,
Atlanta Division.

Sept. 13, 1973.

**832**

Haas, Holland, Levison & Gibert, Atlanta, Ga., for plaintiff.

John W. Stokes, U. S. Atty., N. D. Ga., William D. Mallard, Jr. and Julian Longley, Asst. U. S. Attys., Atlanta, Ga., and Rodger Moore, Tax Div. Dept. of Justice, Washington, D. C., for defendant.

## STATEMENT OF THE CASE

HOOPER, Senior District Judge.

In this case National Service Industries, Inc. has brought an action against the United States of America seeking to recover refund of income taxes paid for its fiscal years 1963, 1964 and 1965. Plaintiff's claim arises upon two purchases made by plaintiff, one purchase concerning assets of Munger Linen Service & Cloverleaf Towel Supply Company from Marilyn and Morris Moscowitz, the other being a portion of the business of Mechanics Uniform Supply Company from said company.

Specifically, there is involved the question as to whether covenants granted by the Sellers to the Purchaser not to compete for a period of ten (10) years after the sale, and customer lists of the Seller conveyed to the Purchaser (no time limit in connection with the same appearing) are to be considered as intangible assets to which a value may be assigned by the Purchaser covering the useful life of said assets.

Another intangible asset contended by the plaintiff to be one which would furnish a basis for tax deductions during its useful life consists of certain contracts between the seller and its employees. This issue, however, is not vigorously urged by petitioner on the trial of this case and no value has been prov-en as a basis for tax deduction, and will be given slight discussion in this opinion.

The plaintiff taxpayer, National Service Industries, Inc., is a corporation incorporated in the State of Delaware with home offices in Atlanta, Georgia, owning and operating a number of branches over the United States, which from time to time purchased assets from other competing companies and added such assets to its own.

I. FINDINGS OF FACT AND CONCLUSIONS OF LAW CONCERNING THE ACQUISITION BY PLAINTIFF OF MUNGER LINEN SERVICE AND CLOVERLEAF TOWEL SUPPLY COMPANY: THE RESTRICTIVE COVENANTS.

1(a). It is stipulated by the parties and included in the pretrial order that the issue between the parties as to covenants not to compete in this transaction is as follows:

"Whether any portion of the purchase price paid to Marilyn & Morris Moscowitz upon acquisition of the Munger Linen Service and Cloverleaf Towel Supply Company is properly allocable to covenants not to compete obtained in connection with that transaction and is amortizable over the term of the covenants."

(b). If the above question is answered in the affirmative then the next question concerns the portion of the price which is allocable and amortizable in the years in question.

2. This covenant not to compete was received by National in connection with the acquisition of the Munger business and was to run for a period of ten (10) years.

3. In the Munger transaction National (which was not then doing business in St. Louis) acquired all of the tangible assets of the Seller in a certain linen service business in St. Louis as well as its intangible assets, including those at issue in this case.

4. Consideration of this sale was $2,400,000.00 which was a lump sum acquisition of a going business without any specific allocation of the purchase price among the assets acquired whether tangible or intangible. On the trial there was a stipulation, however, as to the value of the tangible assets conveyed.

5. Discussions as to the alleged allocation of value to this covenant first arose in a meeting between Mr. Moscowitz, the Seller, together with his attorney, and Mr. Ware and others representing the Purchaser (including its attorney) in November, 1963. The testimony shows that at said meeting Mr. Ware requested an allocation in the contract to the covenant of $400,000.00. Mr. Moscowitz explicitly refused to allocate any amount to the covenant stating that as far as he was concerned this was to be a capital gains transaction. His attorney confirmed this decision. This court finds that there was no meeting of the minds of the parties at such meeting and therefore no agreement was then made. Suggestion by Mr. Ware that there be an allocation was rejected by Mr. Moscowitz.

There was testimony by Mr. Ware that the effect of the statements by Mr. Moscowitz was in substance "you go your way, I'll go mine", a reasonable assumption.

The government earnestly insists that the parties affirmatively agreed at said conference that there should be no allocation. The court finds, however, that there was no agreement either to allocate or not to allocate, but certainly there was no affirmative agreement by the parties that no allocation should be made.[1]

### VALUE OF COVENANT NOT TO COMPETE.

6. In its claim for refund plaintiff alleged a value of $800,000.00, which alleg-

edly was based upon plaintiff's previous experiences with such covenants. This figure was approved by plaintiff's expert witness in this case who testified exhaustively as to all phases of the matter. This witness had testified in behalf of the government in at least one other tax dispute and his qualifications were not sought to be challenged by the government.

7. It is undisputed that the total contract price was $2,400,000.00 and that the total sum paid for tangible assets was $1,173,600.00, this leaving the sum of $1,226,400.00 to cover all intangible values.

8. Plaintiff's expert witness placed the value of the covenant at $800,000.00 by two different methods. First, by computing the value of good will under three methods, two of which had been approved by the government in their own rulings, and subtracting that value from the value of the other intangible assets.

Second, by computing the value of the covenant without reference to good will (using three totally different methods again).

9. The expert testified that each of the foregoing methods used by him arrived at approximately the same result and taken in connection with the evidence in the case seems to amply support the valuation of $800,000.00 as claimed by petitioner.

### CONCLUSIONS OF LAW

1. When a taxpayer claims a right to amortize an intangible asset, acquired in a lump sum transaction, the taxpayer must show with reasonable accuracy, but without exactitude, the value of the intangible asset and its useful life.

Earlier decisions by the courts put the primary emphasis on the intention of the parties to the contract as to whether

---

1. The government does not cite any authorities tending to show that an oral agreement, if made at the time in question concerning the sale for a consideration exceeding $2,000,000.00 would be valid or enforceable, even if such an oral agreement had been made.

or not there was to be an allocation of value of the intangible assets. Earlier cases also referred to the question as to whether or not the covenant could be completely separated from all of the other intangible assets (including good will).

The modern trend of authorities, however, favors the test of "economic reality". See Treasury Regs. 1.167–(a)–3; Houston Chronicle Publishing Company v. United States, 481 F.2d 1240 (1973); Balthrope v. Commissioner, 356 F.2d 28 (5th Cir. 1966); Griswold v. Commissioner, 400 F.2d 427 (5th Cir. 1968); Harry Kinney, 58 T.C. 1038 (1972); Wilson Athletic Goods Mfg. Co., Inc. v. Commissioner of Internal Revenue, 222 F.2d 355 (7th Cir., 1955).

■ 2. Under this latter test, as pointed out above, the taxpayer must show "with reasonable accuracy but without exactitude the value of the intangible assets and its useful life". The useful life of the covenant in question was ten (10) years and the value has been fully discussed above. It is well settled that where the right to recover is clear the mere difficulty in determining with exactitude the amount of recovery will not defeat the same. See Houston Chronicle Publishing Company v. United States, supra.[2]

■ From the foregoing Findings of Fact and Conclusions of Law the Judgment ultimately rendered by the court in this case will permit taxpayer to a total deduction for depreciation over a period of ten (10) years of $800,000.00 covering the above stated covenant not to compete.

## II. THE CUSTOMER LISTS ACQUIRED IN THE MUNGER TRANSACTION

■ It is stipulated between the parties and included in the pretrial order that the following is in issue between the parties:

Whether any portion of the purchase price paid to Marilyn and Morris Moscowitz upon acquisition of Munger Linen Service and Cloverleaf Towel Supply Company is properly allocable to customer lists and related information obtained in connection with that transaction and is amortizable.

If the above question is answered in the affirmative then the question arises as to what portion of the purchase price is allocable and amortizable in the years in question.

If any portion of the purchase price is allocable to the customer lists and related information and is amortizable what is the period of time over which the amortization should take place.

The Findings of Fact concerning the three issues stated above are the following:

1. Among the assets conveyed to plaintiff by Seller were "all trade routes, records and descriptions thereof, and customer lists pertaining to the business of Munger; all contracts and agreements to furnish service (whether oral or written) which said Munger business has with its customers, and all route books and customer lists pertaining thereto."

2. Customer lists have been held to be capital assets which may be depreciated. See Manhattan Company of Virginia, Inc., 50 T.C. 78 (1968).

3. The court finds that customer lists and related information had a value of $240,000.00. Taxpayer determined this value by using its nationwide past experience; it determined the cost of acquiring new business in other localities. It applied this cost of obtaining new business to the volume of new business purchased in the Munger transaction. Although the government contended the taxpayer should have used the figures for the St. Louis area such figures were not available as taxpayer had never been in business in the St. Louis area previously. This[3] would seem to be a fair

---

2. See further discussion of this principle under Conclusions of Law under Part II.

3. That is, the basis used by taxpayer.

basis for valuation and the government did not attempt to show that the cost of obtaining new customers in St. Louis would materially differ from the average cost to petitioner over the country as a whole. There was exhibited to the court, on the trial, weekly reports of new business obtained by each of petitioner's branches. Applying to the gross totals the cost of obtaining the same the unit cost was obtained which applied to the business conveyed to petitioner made up the total of $240,000.00.

4. The useful life of the customer lists and related information is 6.7 years, which is the period over which said asset should be amortized. In order to determine this useful life taxpayer determined from its own books and records (using the weekly reports referred to above) the percentage of its business that it lost each year. Taxpayer found that it lost approximately 15 per cent of its business each year. This led to the conclusion that it lost all of its business, in other words that it had a complete turnover of business, each 6.7 years. It therefore further concluded that the new business acquired in the Munger transaction would be lost 6.7 years from date of acquisition.

The past experience which taxpayer relied upon was the experience of all of its branches on a nationwide basis. The government contended that for an accurate determination taxpayer should have used experience in the St. Louis area.

This court finds that the basis relied upon by the petitioner is fully as useful as the basis insisted upon by the government, even assuming that evidence was available to petitioner at the time of closing the contract which illustrated the useful life experienced by the Seller.

Another factor may be considered on this question. Whether or not the customers continued to use the service of the business in question depended primarily, if not competely, upon the nature of the services rendered by the plaintiff.

## CONCLUSIONS OF LAW

1. Section 167(a) of the Internal Revenue Code of 1954 states the General Rule as to depreciation allowance as follows:

"There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including reasonable allowance for obsolescence)—

(1) of property used in the trade or business, or

(2) of property held for the production of income." I.R.C. 167(a).

2. Section 1.167(a)–3 of the Regulations speaks to the problem of depreciation of intangible assets as follows:

"If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subect to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. . . ." Regs. 1.-167(a)–3.

3. In construing the above code section and regulation the Fifth Circuit Court of Appeals most recently spoke to this problem in Houston Chronicle Publishing Company v. United States, 481 F.2d 1240 (1973). In that case of very similar facts the court allowed a deduction for depreciation of the value of a newspaper subscription list purchased in a lump sum transaction by the taxpayer. See especially page 1253 which said:

"Our view—that amortizability for tax purposes must turn on factual bases—is more in accord with the realities of modern business technolo-

gy in a day when lists are bartered and sold as discreet vendable assets. Extreme exactitude in ascertaining the duration of an asset is a paradigm that the law does not demand. All that the law and regulations require is reasonable accuracy in forecasting the asset's useful life."

4. See also Manhattan Company of Virginia, Inc., 50 T.C. 78 (1968) where the tax court found the customer lists of a laundry were a capital asset having a useful life of more than one year and therefore subject to the depreciation allowance.

It therefore follows that the Judgment in this case shall find the value of the customer lists in question to be $240,000.00 and that its useful life is 6.7 years and that it is an item upon which depreciation may be computed.

### III. EMPLOYEE CONTRACTS IN THE MUNGER SALE.

This issue as stipulated by the parties and contained in the pretrial order is the following:

"Whether any portion of the purchase price paid to Marilyn and Morris Moscowitz upon acquisition of Munger Linen Service and Cloverleaf Towel & Supply Company is properly allocable to the employee contracts obtained in connection with that ·transaction and is amortizable."

Among the assets conveyed in this sale are the following:

"All contracts with Managers, Supervisors, Routemen, and Salesmen of Sellers and/or their predecessor in title, Munger, and whether or not such contracts are included in any Union contract held by Sellers and/or their predecessor in title, Munger."

No case is cited by the petitioner to the effect that such employment contracts, even when a value is shown and a useful life is shown, furnish a basis for depreciation, but the statutes, regulations and decisions cited above might well cover such employee contracts.

The court agrees, however, with the contentions of the government as expressed in its brief that "taxpayer's only evidence with respect to these contracts was an estimate of Mr. Sugarman, a corporate officer, that the average cost of enforcing a restrictive convenant in such a contract amounted to $5,000.00." It is further stated: "The government asserts that indeed, the cost of legal enforcement proceedings is totally unrelated to the value of the contracts, if any." Even assuming that all other elements are proven which would render these contracts a depreciable asset evidence showing merely that, should litigation arise concerning the same, taxpayer would be put to the expense of $5,000.00 in defending the same is not a proper measure of the intangible asset so as to make it one subject to depreciation by the taxpayer.

It may be noted that many such contracts are attacked in the courts by employees as being unreasonable as to both time and area, and the expenses of defending such attacks falls upon the employer seeking to enforce the same. This case does not invoke an effort upon the part of the taxpayer to recover as a business expense any amounts actually paid or incurred in defending an action attacking employment contracts in question.

The Judgment in this case will not allow any deductions for depreciation on the above item.

### IV. COVENANT NOT TO COMPETE CONTAINED IN MECHANICS UNIFORM SUPPLY COMPANY TRANSACTION.

This issue is stipulated by the parties and contained in the pretrial order as follows:

Whether any portion of the purchase price in the acquisition of a portion of Mechanics Supply Company is properly allocable to covenant not to compete obtained in connection with that transaction and is amortizable over the terms of the covenant.

1. On September 30, 1963 taxpayer purchased a portion of Mechanics Uniform Supply Company, being the San Antonio, Texas area. The total purchase price was .$102,788.40 (later adjusted to $97,288.40) which was a lump sum purchase price. While there was no specific allocation in the contract to any of the assets purchased, whether tangible or intangible, it is stipulated that $26,545.00 represented a cost of tangible assets. Taxpayer claimed the balance of $70,743.40 as being allocable to the covenant not to compete and claimed deductions for depreciation based thereon.

2. Neither in the claim for refund filed with the government nor upon its denial in the trial of this case has any allocation been made by the evidence as between the value of the covenant not to compete and of the value of the customer lists and information concerning the same which total the sum of $70,743.40, but there is also included in that sum the value of the good will and any other intangible assets.

Neither was there any expert testimony adduced to this claim such as was adduced in connection with the taxpayer's claim for depreciation in connection with the similar convenant in regard to the purchase of the Munger assets.

3. One of taxpayer's witnesses testified that one of the principal intangible assets in this transaction consisted of the customer list and information. However, taxpayer has in no way attempted to differentiate this intangible asset from any others.

4. In short, taxpayer has failed to present to this court sufficient evidence to establish that its original determination as to value of the covenant was correct, or sufficient evidence which would enable this court to do so.

## CONCLUSIONS OF LAW.

1. The burden is on the taxpayer in suits against the United States not only to show that the assessment as made by the Commissioner was erroneous but also to show the facts upon which a determination can be made of the amount of recovery. See Law of Federal Income Taxation by Mertens, Vol. 10, Sec. 58A.01 and cases cited.

2. In a suit by a taxpayer for refund based upon the contention that a covenant not to compete had a value of $70,743.40 mere proof that that sum represented all of the intangible assets conveyed to the taxpayer without any allocation of said sum between the covenant not to compete and other intangible assets whether or not subject to depreciation without any sufficient evidence to show the value of either is not sufficient as a basis for the finding of any specific amount to be allocated to the covenant not to compete.

The Judgment in this case therefore will not allow to the plaintiff any refund based upon this claim for deductions in connection with the covenant not to compete contained in the Mechanics Uniform transaction.